**Manfred BAUM, Ruth Baum, Richard Beck Ira Brown, Joel David and Joann David, Andrew Hadjandreas and Helen Hadjandreas, Abe Klein and Rena Klein, Herbert Lowenthal, and Helen Scire, Plaintiffs,**

**and**

**Judith and Roger Hurcomb and Larry J. Kornhaber, Plaintiffs-Intervenors,**

**v.**

**PHILLIPS, APPEL & WALDEN, INC., Harold Asch, and Merrill Lynch, Pierce Fenner & Smith, Inc., Defendants.**

No. 81 Civ. 5912 (PKL).

United States District Court, S.D. New York.

Dec. 8, 1986.

Joseph M. Weitzman, New York City, for plaintiffs Baums, Beck, Brown, Davids, Hadjandreases, Kleins and Lowenthal.

Edward J. Swan, New York City, for plaintiff Scire.

Marc E. Grossman, White Plains, N.Y., for plaintiffs-intervenors Hurcombs and Kornhaber.

Hartley T. Bernstein, New York City, for defendant-cross-claimant Asch.

Bressler, Director & Rothenberg, New York City, for defendant Philips, Appel & Walden, Inc.; Robert F. Brantl, Bernard Bressler, Brian F. Amery, of counsel.

Rogers & Wells, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.; Stanley Godofsky, James N. Benedict, of counsel.

LEISURE, District Judge:

This action arises under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (1983 & Supp.1986), and Rules 10b–5 and 10b–16 promulgated thereunder, 17 C.F.R. § 240–10b–5 and 10b–16 (1986); New York Stock Exchange Rule 431; §§ 7, 15, 9(a)(2) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78g, 78o, 78i(a)(2) and 78t(a) (1983 & Supp.1986); and § 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. 77q(a) (1983). The Court's jurisdiction is invoked pursuant to 15 U.S.C. §§ 77v and 78aa. The complaint also sets forth claims pursuant to 18 U.S.C. §§ 1961–68 (1979 & Supp.1986), known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and pendent state law claims of fraud, breach of fiduciary duty and breach of contract.

## FACTUAL BACKGROUND

Briefly stated the facts are as follows: this action was commenced in September of 1981 by twelve customers of Harold Asch ("Asch"), a registered representative employed by the brokerage house of Phillips, Appel & Walden, Inc. ("PAW"). The plaintiffs brought their complaint against Asch, PAW and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), which was the clearing agent for PAW. Subsequently three more customers of Asch intervened with an identical complaint. The fifteen complainants shall be referred to hereinafter collectively as plaintiffs.[1]

The Complaint relates to a period of approximately two months in July and August of 1981 wherein it is alleged that Asch, pressured by the threat of personal stock market losses in excess of one million dollars, engaged in a series of fraudulent schemes involving the defendant stock brokerage firms, resulting in multi-million dollar losses to the plaintiffs. Plaintiffs allege a premeditated scheme by Asch, PAW and Merrill Lynch to defraud plaintiffs in connection with their holdings in Pittsburgh-Des Moines ("PDM") common stock. In essence, plaintiffs allege that defendants manipulated the trading of PDM common stock and thereby willfully violated the aforesaid antifraud provisions of the federal securities laws.

Plaintiffs, other than Ruth Baum, each had a margin account with PAW prior to the events giving rise to this lawsuit in July and August of 1981. (Affidavit of John Starr, sworn to on Feb. 7, 1985, ¶ 2) ("Starr Aff."). Asch was the stockbroker employed by PAW who serviced plaintiffs' accounts. (Affidavit of Burton Cavallo, sworn to on Feb. 7, 1985, ¶ 3) ("Cavallo Aff."). Beginning in 1979, Merrill Lynch acted as the clearing broker for PAW. (Cavallo Aff., ¶ 3). As clearing broker, Merrill Lynch was responsible for much of PAW's required recordkeeping. Merrill Lynch also lent money to customers of PAW, including plaintiffs, to purchase securities on margin. *Id.* However, Merrill Lynch did not have any direct dealings with plaintiffs. *Id.* at ¶ 4. Plaintiffs, without exception, placed each of their orders for securities trades through PAW and it was PAW which executed those trades. *Id.*

In 1981, all plaintiffs excluding Ruth Baum held the common stock of PDM in their margin accounts with PAW, and, in a number of instances, other securities as well. *See* Affidavit of Stephen J. Cucchia, sworn to on Feb. 7, 1985, ¶ 15) ("Cucchia Aff."). Asch also maintained two margin accounts (one in his name and one in the name of his wife) and was heavily invested in PDM. (Cuchia Aff., ¶ 19). Originally, the investments in PDM were highly successful. A number of plaintiffs and Asch used the buying power generated by the rise in PDM to buy still additional investments in PDM.

PDM is listed on the American Stock Exchange and has historically been thinly traded. By January 1981, the price of PDM had reached a record high of about

---

**1.** The parties to this action submitted a Consent Pre-Trial Order ("Pre-Trial Order") on November 9, 1985. Plaintiffs' Verified Second Amend- ed Complaint as marked and attached as Exhibit A to the Pre-Trial Order shall be referred to hereinafter as the "Complaint."

**1522**

$60.00 per share. (Affidavit of Harold Asch, sworn to on April 3, 1985, ¶ 5) ("Asch Aff."). At this time, Asch owned or controlled in customer's accounts approximately 150,000 shares of PDM stock. (Asch Answer to Complaint, ¶ 1) ("Asch Answer"). The amount of stock controlled by Asch constituted a substantial block of PDM. On an average, no more than approximately a few hundred shares per day passed hands. (Complaint, ¶ 14(c); Asch Aff., ¶ 3). Thus, sale by Asch or any of his customers of a few hundred or more shares of PDM could have a significant effect on the market price of PDM. (Complaint, ¶ 14(d); Asch Aff., ¶ 4).

Commencing January 20, 1981, the market price of PDM began to decline. (Complaint, ¶ 14(e); Asch Answer, ¶ 1). By early July 1981, the decline became precipitous, causing the accounts of Asch and plaintiffs to drop below the 30% margin requirements of Merrill Lynch and thereafter below the 25% equity levels required by the New York and American Stock Exchanges. (Memorandum of Law submitted on behalf of Harold Asch, p. 3) ("Asch Memo."). Concerned about their losses and impending margin calls, plaintiffs ordered the sale of a portion of their respective PDM shares, so that none of the individual accounts would be adversely affected by the wholesale selling of any one individual account.

Plaintiffs allege that PAW had "inside" information that at 1:00 PM on July 23, 1981, PDM would report improved earnings, and for that reason PAW sought to purchase a block of 60,000 shares from the plaintiffs, collectively, through Asch, prior to the release of the aforesaid information and without disclosing the "inside" information to plaintiffs. The plaintiffs allegedly ordered the sale of their shares in connection with the block. However, the block was not assembled and the sale never occurred. (Complaint, ¶¶ 19, 20).

The Complaint next alleges that defendants thereafter undertook to prevent plaintiffs from selling their shares of PDM until the market price was sufficiently depressed that a corrective rebound was assured. (Complaint, ¶ 24). PAW and Merrill Lynch are alleged to have violated margin requirements by failing to liquidate plaintiffs' accounts when they fell below margin requirements. (Complaint, ¶ 25(a)–(b)). PAW and Merrill Lynch are further alleged to have depressed the market price of PDM by means of (1) sales by Merrill Lynch "in an effort to manipulate the market price of the stock downward;" and (2) a plan by Merrill Lynch and PAW to prevent their employees from buying PDM. (Complaint, ¶¶ 26(a)(b)).

Harold Asch is alleged to have participated in this scheme by having (1) "refused to effectuate and/or sought to discourage" orders from plaintiffs for the sale of PDM; (2) advised plaintiffs to sell the other securities in their accounts and/or sold the other securities without authorization; and (3) advised plaintiffs to buy yet more PDM. However, it is not alleged that plaintiffs took any action based upon Asch's advice. Rather, the testimony of plaintiffs is that each of them remained intent upon selling their shares of PDM.

Plaintiffs allege that, as a result of defendants' scheme, the price of PDM fell to $22.00 on the American Stock Exchange, and plaintiffs' shares were sold to meet the margin calls. (Complaint, ¶¶ 27–28). But for the scheme of PAW and Merrill Lynch, plaintiffs contend that their shares would have been sold at about $35.00 per share. (Complaint, ¶ 29).

PAW and Merrill Lynch counter that the only forseeable result of such a drop, and the result that actually occurred, was that Merrill Lynch was left with unsecured margin debt in excess of $213,000.00 owed to it by Asch and plaintiffs. It is further claimed that none of of the aforementioned sum has yet been recovered. (Cucchia Aff., ¶¶ 6, 8).

Asch answered the Complaint in July of 1982 and cross-claimed against PAW and Merrill Lynch. ("Cross-Claims"). Asch acknowledged most of plaintiffs' allegations, denying only those directed against him, but claimed that PAW and Merrill Lynch

were responsible for the damages alleged by plaintiffs. Asch's allegations are patterned after those of plaintiffs, except that he denies that he failed to effectuate orders. (Cross-Claims, ¶ 11). Asch describes himself as having been "unwittingly made a party to a scheme and conspiratorial plan of defendants PAW and Merrill Lynch." (Cross-Claims, ¶ 37). However, the only allegations in the Cross-Claims related to the securities in Asch's own accounts are allegations that mimic the Complaint. Asch alleges that his account was undermargined throughout July of 1981 (Cross-Claims, ¶ 34), and that when on July 24, 1981, he requested PAW and Merrill Lynch to sell a block of 100,000 shares of PDM owned by Asch and his customers, he was refused. Asch's Cross-Claims cite the same sections of the Securities Act and Exchange Act as plaintiffs' Complaint. PAW and Merrill Lynch contend that, stripped of supposition and conclusory allegation, Asch's claim readily reduces to one of nonfeasance.

### MOTIONS

After the close of discovery, defendants PAW and Merrill Lynch each submitted motions for judgment on the pleadings, or, in the alternative, for summary judgment, asking the Court to dismiss the Complaint and Cross-Claims in their entirety for failure to state any claim arising under the federal securities laws. In addition, Merrill Lynch has filed a Motion for Summary Judgment for Payment of Debit Balances against plaintiffs and Asch. Plaintiffs (with the exception of Dr. Helen Scire) have filed motions in opposition and have cross-moved for Judgment on the Pleadings against all defendants. A separate affidavit and memorandum of law have been submitted on behalf of Dr. Scire, her sole allegation of fraud being that Asch breached his assurance that he would sell her shares of PDM and instead sold the non-PDM securities which she maintained in her account.

The motions submitted by defendants rest, in part, on the grounds that plaintiffs' allegations do not aver with sufficient particularity the events giving rise to any alleged fraud. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Second Circuit has held that "mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b-5 are insufficient." *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir.1971) (citations omitted). Rather, a plaintiff alleging fraud must set forth a factual predicate for the allegations, including specific facts, the sources from which the facts were derived, and "a basis from which an inference of fraud may fairly be drawn." *Crystal v. Foy*, 562 F.Supp. 422, 424–25 (S.D.N.Y.1983).

Plaintiffs have alleged facts which permit the Court to infer fraud in general and scienter in particular. According to plaintiffs, Asch stated that his current intention was to liquidate the shares in PDM, but he did not liquidate. From this, the Court may fairly infer that Asch's statement of current intention was false, that Asch knew it was false, and that he made the false statement with the motive of artificially raising the price of PDM. Plaintiffs claim to have relied on Asch's representation that he would sell the shares of PDM in plaintiffs' accounts, and to have suffered damages as a result. The Court, therefore, cannot dismiss the securities fraud claims, as defendants insist, on the grounds that the Complaint does not allege deceptive or manipulative practices.

The arguments presented by PAW and Merrill Lynch, in support of summary judgment to dismiss the action, focus on the alleged absence of evidence that they made any material misrepresentation or omission in connection with the purchase or sale of a security which caused damage to plaintiffs or Asch. The gravamen of plaintiffs' Complaint is a failure to sell, while the thrust of Asch's Cross-Claims is that he was unwittingly made a participant in a conspiratorial plan by Merrill Lynch and PAW to artifi-

cially manipulate the price of PDM. PAW and Merrill Lynch insist that plaintiffs merely fill the background of their story with incidental episodes of intrigue which they present as evidence of fraudulent intent. Thus, PAW and Merrill Lynch claim that plaintiffs and Asch are unable to state any claims arising under the federal securities laws for which they have offered any supporting evidence.

The affidavits, exhibits and deposition transcripts submitted by all parties to this litigation raise matters outside the scope of the pleadings. Pursuant to Rule 12(c), Fed. R.Civ.P., the Court will treat all motions as motions for summary judgment.[2] For the reasons set forth below, summary judgment is granted in favor of PAW and Merrill Lynch, dismissing the Complaint and cross-motions of plaintiffs and the Cross-Claims of Asch. The Court declines to exercise pendent jurisdiction over the Merrill Lynch Motion for Summary Judgment for Payment of Debit Balances.

## LEGAL DISCUSSION

Summary judgment shall be granted only if "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). On a motion for summary judgment, we are mindful of the maxim that "the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975) (citations omitted). Yet, "it must be remembered that the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). A party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

While the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman, supra,* 524 F.2d at 1320 (citation omitted), if the evidence proffered to support plaintiff's theory and to rebut the motion for summary judgment "consists largely of conclusory statements.... [s]uch testimony, unsupported by documentary or other concrete evidence ... is simply not enough to create a genuine issue of fact...." *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita, supra,* 106 S.Ct. at 1356 (citation omitted).

Moreover, the Second Circuit Judicial Conference recently concluded that summary judgment dispositions should be made "more readily available in appropriate cases." Second Circuit Committee on the Pretrial Phase of Civl Litigation, Final Report, at 3 (June 11, 1986). *See also Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11, 12 (2d Cir.1986). Having thoroughly reviewed the record, the Court finds that no genuine issue of fact exists with regard to to plaintiffs' ability to state a claim arising under the federal securities laws. Each alleged violation is considered seriatim.

### Section 10(b) and Rule 10b–5

The essential elements of a § 10(b) or Rule 10b–5 claim for damages are, as follows:

(1) damage to plaintiff, (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud, (3) made with an intent to deceive, manipulate or defraud, (4) in connection with the purchase or sale of securities and (5) furthered by defendant's use of the mails or any facility of a national securities exchange.

**2.** Although plaintiffs do not bring their cross-motion in the alternative for summary judg- ment, they have included a separate 3(g) statement pursuant to the Local Rules of this Court.

*Lloyd v. Indus. Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 810 (S.D.N.Y.1978) (citations omitted).

PAW does not dispute that the allegations of the Complaint and the supporting evidence are sufficient to allow proof of elements (1) and (5) above. PAW concedes that "[t]here may be issues of fact as to whether PAW and Asch acted in accordance with the standards of reasonable conduct in the securities industry." PAW further concedes the possibility that "Asch breached his contract with and duties to plaintiffs by failing to execute orders they allegedly gave him," and further that PAW may be secondarily liable to plaintiffs for Asch's fault. (Memorandum of Law submitted on behalf of PAW, p. 12) ("PAW Memo."). Notwithstanding, PAW contends that the Complaint is insufficient because it makes only conclusory allegations of fraud which do not even relate to the "purchase" or "sale" of a security and thus that there is no genuine issue as to any fact which is material to any claim arising under the federal securities laws.

In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court recognized the continued vitality of the rule articulated in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and held that only those plaintiffs that have actually purchased or sold securities may bring an action under Rule 10b–5. Elaborating on the parameters of this rule, the Supreme Court further held that plaintiffs who allege that they were fraudulently induced not to purchase securities lack standing to sue under Rule 10b–5. "This rule similarly operates to foreclose claims by persons who allege that they were fraudulently induced not to *sell* securities." *Goldman v. A.G. Becker, Inc.,* [1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,172 at 95,655 (S.D.N.Y.1983) [Available on WESTLAW, DCTU database] (citing *Gurley v. Documation Inc.,* 674 F.2d 253, 256 (4th Cir.1982)) (emphasis in the original).

The Complaint alleges that during the period in 1981 spanning July 23 to August 4, Asch "refused to effectuate and/or sought to discourage direct orders from plaintiffs to sell some or all of their PDM stock." (Complaint, ¶ 25(c)). Asch's Cross-Claims similarly allege, as to Asch's own trading activities, that he was blocked from selling his own shares of PDM (Cross-Claims, ¶¶ 45–46), and that he requested sales but was refused. (Cross-Claims, ¶ 54).

Plaintiffs assert they gave Asch definite orders to sell their shares in PDM, that Asch misled them into thinking that the sales would be carried out; and that they relied on Asch's assurances and suffered damages as a result. Thus, plaintiffs contend that the alleged fraud was "in connection with the sale or purchase" of a security as required by § 10(b) of the Exchange Act. Plaintiffs argue that the concern expressed by the Supreme Court in *Blue Chip Stamps,* of unlimited potential litigation and speculative claims, is unwarranted in such situations. Their claims are premised on the notion that by giving Asch a definite order to sell, they expressed a more definite and certain intention and desire to act than the potential plaintiffs with which *Blue Chip Stamps* seemed to be concerned. In essence, the plaintiffs ask this Court to recognize an exception to the rule of *Blue Chip Stamps* for non-sales or non-purchases resulting from a broker's fraudulent failure to execute a sales order given by a customer.

Plaintiffs further argue that they meet the purchaser-or-seller test of *Blue Chip Stamps,* since they eventually sold their shares. Because they are sellers of securities in the literal sense, plaintiffs maintain that they are entitled to relief if they can show that the alleged frauds were "in connection with" their sales, as required by § 10(b) of the Exchange Act and by Rule 10b–5.

Plaintiffs rely on cases which have allowed a narrowly construed exception to the *Birnbaum* rule to permit a Rule 10b–5 suit predicated on a deferred sale. Courts

have allowed suits to proceed in such situations "where the plaintiffs signify to the defendant their present intention to sell their shares and are specifically induced thereafter by a fraudulent scheme to retain their shares." *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 100 (S.D.N.Y.1976). *See also Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir.1973); *Stockwell v. Reynolds & Co.,* 252 F.Supp. 215 (S.D.N.Y.1965). However, this set of facts does not correspond to those alleged by plaintiffs and Asch. They do not claim to have been induced by a fraud to retain their shares, but allege that they consistently attempted to sell them. The claimed deception lies in Asch's allegedly repeated representations that he would, indeed, sell. In light of the Supreme Court's criticism of the "case-by-case erosion" of the *Birnbaum* rule which would occur if exceptions to it are permitted, *Blue Chip Stamps, supra,* 421 U.S. at 755, 95 S.Ct. at 934, and the Supreme Court's restrictive view of standing to sue under Rule 10b–5, adherence to the exception delineated in *Rich v. Touche Ross, supra,* is all but extinct.[3] *See Gurley v. Documation, supra,* 674 F.2d 253 (analysis of the policies underlying the *Blue Chip Stamps* decision is persuasive that one who claims that he was fraudulently induced to delay a sale of securities must, like a nonseller, be denied standing under § 10(b)).

Moreover, it is not alleged in the Complaint that the actions of defendants induced the plaintiffs to do or not to do anything. Plaintiffs resolved to sell their shares of PDM and remained steadfast in this resolve despite the inducement of Asch not to sell. Thus, plaintiffs' allegations do not fit into a pattern that is actionable under § 10(b). Rather, plaintiffs' allegations sound more like an ordinary breach of contract or breach of fiduciary duty claim:[4] plaintiffs ordered Asch, their broker, to do certain things, and Asch failed to do them. In short, plaintiffs do not state a § 10(b) cause of action against the defendants under the rule of *Blue Chip Stamps.*[5]

### Minimum Maintenance Requirements

Count Ten of the Complaint and the Ninth Cross-Claim allege that Merrill Lynch failed to liquidate plaintiffs' shares in PDM when their accounts fell below the minimum levels of equity required to be maintained in margin accounts pursuant to Rules 7 and 10b–16 of the Exchange Act. The Second Circuit recently held that no private right of action exists under Rule 7. *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 312 (2d Cir.1985). This claim is therefore dismissed. The Rule 10b–16 claim, however, poses a more difficult question.

**3.** Plaintiffs cite the case of *Yoder v. Orthomolecular Nutrition Institute,* 751 F.2d 555 (2d Cir. 1985) for the proposition that the making of a contract for sale is a sale of security even if the security is not delivered. However, *Yoder* was concerned with whether employment services constituted "value" for purposes of § 2(3) of the Securities Act which defines "sale." 15 U.S.C. § 77b(3). The decision did not change the rule that a sale occurs only when value is given by the buyer and the incidents of ownership are relinquished by the seller. *Halperin v. Edwards and Hanly,* 430 F.Supp. 121 (E.D.N.Y.1977). Thus, giving a broker an order to sell does not constitute "sale" as defined by the Securities Act.

**4.** It is clear that a breach of fiduciary duty by itself is not enough to make out a federal claim. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). The absence of this Court's jurisdiction does not affect the plaintiffs' likelihood of success in another forum on claims alleging breach of contract and breach of fiduciary duty. New York law allows plaintiffs six months to refile their state law claims in a state court. *See* N.Y.C.P.L.R. § 205 (McKinney's Supp. 1986); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

**5.** Plaintiff Helen Scire maintains that Asch's unauthorized sale from her account of non-PDM securities satisfies the "in connection with" requirement of Rule 10b–5. However, unauthorized trading is, by definition, an overt breach of duty. As such, it may give the wronged investor a common law claim, but does not state a cause of action arising under § 10(b) or Rule 10b–5. *See Pross v. Baird, Patrick & Co.,* 585 F.Supp. 1456, 1460 (S.D.N.Y.1984). Moreover, "*Blue Chip Stamps* does not permit recovery under Rule 10b–5 when alleged fraud causes an investor to retain ownership in securities." *Sacks v. Reynolds Sec., Inc.,* 593 F.2d 1234, 1241 (D.C. Cir.1978) (citing *Halperin v. Edwards, supra,* 430 F.Supp. at 124–25).

Investors maintain margin accounts with brokerage firms for the very purpose of trading in securities. They need accurate information regarding the credit terms of their margin accounts in order to evaluate the desirability of purchasing securities on margin. The amount required to service the debt in a margin account may affect the profitability of such trading. Moreover, disclosure of the rate and method of calculation of interest payments is also critical in order that an investor will not become overextended, and then be forced to liquidate, possibly at substantial losses, all or part of his or her margin holdings in order to meet a margin call.

Rule 10b–16 of the Exchange Act requires certain disclosures regarding credit terms of margin accounts "in connection with" a securities transaction.[6] However, neither § 10(b) nor Rule 10b–16 explicitly provide for a private right of action. The only three Courts of Appeals to have considered this issue have found an implied right of action under Rule 10b–16. *See Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939 (3d Cir.1985); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530 (9th Cir.1984); *Liang v. Dean Witter & Co.,* 540 F.2d 1107 (D.C.Cir.1976).

The Court of Appeals for the Second Circuit has raised but not reached this issue. *Zerman v. Ball,* 735 F.2d 15, 23 (2d Cir.1984) *See also Zerman v. Melton* 735 F.2d 751 (2d Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 135, 88 L.Ed.2d 111

(1985) (affirming on other grounds Judge Sofaer's lower court decision which found that Rule 10b–16 does not provide for a private right of action). Moreover, the district courts within this Circuit appear evenly divided. Judge Haight, in *Slomiak v. Bear Stearns & Co.,* 597 F.Supp. 676, 677–81 (S.D.N.Y.1984), examined the "continually evolving judicial formulations of the circumstances giving rise to a private right of action," and found that such a right exists under Rule 10b–16. *But see Zerman v. Melton,* No. 82–6846 slip op. (S.D. N.Y. Apr. 12, 1982); *Establissement Tomis v. Shearson Hayden Stone, Inc.,* 459 F.Supp. 1355, 1361 (S.D.N.Y.1978) (both cases holding that no private right of action exists under Rule 10b–16).

■ This Court, however, need not decide this hotly contested issue because plaintiffs have failed to present a proper claim. Neither the Complaint of plaintiffs nor the Cross-Claims of Asch, nor the answering papers thereto, set forth any specific information concerning interest rates and other charges in connection with the opening and/or maintenance of a margin account which defendants failed to disclose. Scrutiny of plaintiffs' Complaint not only does not disclose a factual predicate for allegations of improper liquidation of plaintiffs' margin accounts but also demonstrates that plaintiffs have failed to specify the stock exchange rules allegedly violated.[7] The only allegation which purports to

---

**6.** Rule 10b–16 provides, in relevant part, as follows:

(a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:

(1) Is given or sent at the time of opening the account, a written statement or statements disclosing (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that can be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged

and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required....

17 C.F.R. § 240.10b–16.

**7.** The supporting affidavit of plaintiffs' margin expert, John J. McCann, sworn to on March 21, 1985 ("McCann Aff."), alleges that Merrill Lynch violated the margin maintenance requirements set forth in Rule 431 of the New York Stock Exchange. According to Rule 431(b), "[t]he margin which must be maintained in margin accounts of customers ... shall be ... (1) 25%

state the factual basis for a claim under Rule 10b–16 reads as follows:

In connection with the maintenance of said margin accounts, defendants PAW and Merrill Lynch intentionally failed to disclose to the plaintiffs the material information concerning requirements, practices and procedures involved in the maintenance of a margin account.

(Complaint, ¶ 9b)

■ Much of the information required to be disclosed by Rule 10b–16 is set forth in the customer agreements signed by plaintiffs and Asch. *See* Cucchia Aff., Exhibit 1. The only information required to be disclosed in connection with the maintenance of margin accounts is set forth in Rule 10b–16(a)(2). This aspect of the Rule requires that the customers be sent written statements, at least quarterly, disclosing the balance in the account, interest rate charges and other credit information. Plaintiffs do not dispute that Merrill Lynch prepares a monthly statement, containing all of this information, which was sent by PAW to each of the plaintiffs, plaintiffs-intervenors and Asch. *See* Cucchia Aff., Ex-

hibit 2. Moreover, plaintiffs do not claim to be unsophisticated investors.[8] Generally, brokers dealing with unsophisticated investors are "under an affirmative duty to fully disclose to the client, in language he or she can understand, the nature of the transactions in the account." *Brill v. Prudential-Bache Sec., Inc.*, No. 84–0846, slip op. at 5 (S.D.N.Y. July 29, 1985) (available on Lexis, Genfed library, Dist. file [Available on WESTLAW, DCTU database]). No suggestion has been presented to this Court that plaintiffs were unable to understand their monthly financial statements. Accordingly, and for the reasons set forth above, all Rule 10b–16 claims are dismissed.

*Section 15*

■ Count Five of the Complaint and the Fifth Cross-Claim allege that PAW and Merrill Lynch violated § 15(c)(1) of the Exchange Act. Plaintiffs concede, in their answering papers, that they have failed to state a claim under this section. However, plaintiffs contend that their invocation of § 15(c)(1) was "a typographical error," and that the correct citation should be to

---

of the market value of all securities "long" in the account...." In addition, Rule 431(d)(6) requires that "[t]he amount of margin ... required by any provision of this Rule shall be obtained as promptly as possible and in any event within a reasonable time." Plaintiffs concede that Merrill Lynch maintained a "house rule" margin maintenance requirement of 30% (McCann Aff., ¶ 8), yet allege that even this additional 5% safety margin did not meet the requirements of Rule 431(d)(1) entitled "Determination of Value for Margin Purposes."

Rule 431(d)(1) states as follows:

Active securities dealt in on a regular exchange shall, for margin purposes, be valued at current market prices. Other securities shall be valued conservatively in the light of current market prices and the amount which might be realized upon liquidation. Substantial additional margin must be required in all cases where the securities carried are subject to unusually rapid or violent changes in value, or do not have an active market on a recognized exchange, or where the amount carried is such that it cannot be liquidated promptly. Although nowhere alleged in the Complaint, plaintiffs maintain that, in view of the "unusually rapid or violent changes in value" of PDM during the summer of 1981, this stock should

have been valued more conservatively and thus would have been liquidated more promptly. *See* McCann Aff., ¶ 15.

"Margin maintenance requirements were not promulgated to protect investors but rather to ensure broker solvency by requiring sufficient collateral for the loans used to finance customers' transactions." *Establissement Tomis, supra*, 459 F.Supp. at 1361 (citations omitted). If Merrill Lynch indeed violated the New York Stock Exchange margin maintenance rules, and the evidence suggests that it did not, plaintiffs may bring an action before the Securities Exchange Commission. It is not for the District Court to discipline a brokerage house at the request of a private party. Plaintiffs' claims under Rule 431 do not support a private right of action for damages, *id.*, and are therefore dismissed.

**8.** The Complaint, as originally filed, alleged that plaintiffs were unsophisticated investors and had not been adequately informed of the risks of owning PDM. However, when plaintiffs "marked" the Complaint, they removed the allegations of unsophistication, and the Pre-Trial Order nowhere mentions their alleged unsophistication or any misrepresentations made to them about PDM. Accordingly, the Court assumes that this entire claim has been abandoned.

§ 15(c)(3). (Plaintiffs' Memorandum of Law in Opposition, p. 26) ("P. Answer Brief")

Section 15(c)(3) prohibits the purchase or sale of securities in contravention of any rules the Securities Exchange Commission ("SEC") shall proscribe to provide safeguards with respect to the financial responsibility of brokers. 15 U.S.C. § 78o(c)(3). Nowhere in their briefs or supporting affidavits do plaintiffs specify which rules or regulations of the SEC regarding the financial responsibility of brokers defendants have allegedly contravened or attempted to contravene in violation of § 15(c)(3), nor do plaintiffs set forth any facts to support such a claim.

Nevertheless, it is immaterial whether the allegation relates to § 15(c)(1) or § 15(c)(3) since it is clear that plaintiffs do not present a valid claim. The Ninth Circuit has held, albeit on different facts, that no private right of action exists under § 15. *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1313–14 (9th Cir.1982). This holding has been uniformly followed in subsequent decisions by courts considering the issue. *See Shotto v. Laub,* 632 F.Supp. 516, 518 (D.Md.1986); *Olsen v. Paine Webber, Jackson & Curtis, Inc.,* 623 F.Supp. 17, 18 (C.D.Fla.1985); *Berner v. Lazzaro,* 730 F.2d 1319, 1320 n. 1 (9th Cir.1984).

Plaintiffs do cite a prior decision in this Circuit which reaches a contrary result. *Opper v. Hancock Sec. Corp.,* 250 F.Supp. 668 (S.D.N.Y.), *aff'd per curiam,* 367 F.2d 157 (2d Cir.1966). However, this decision was rendered more than a decade before the Supreme Court set forth the test in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), for implying a private right of action.[9] Thus, the holding in *Opper, supra,* has not been followed. The only other case cited by plaintiffs, *Resnick v. Touche Ross & Co.,* 470 F.Supp. 1020 (S.D.N.Y.1979), did not hold that there was an implied right of action under § 15(c)(3), but rather granted defendant's motion to dismiss a claim that was brought under that section. *Id.* at 1023 n. 2.

In the absence of any indication of congressional intent to create a private right of action for violations of § 15, plaintiffs' fifth cause of action is dismissed. *See Grey v. Gruntal & Co.,* No. 84–5036, slip op. at 9 (S.D.N.Y. Dec. 14, 1984) [Available on WESTLAW, DCTU database] (available on Lexis, Genfed library, Dist. file).

### Market Manipulation

Count Eleven of the Complaint and the Tenth Cross-Claim purport to state claims arising under § 9(a)(2) of the Exchange Act.[10] For this alleged violation plaintiffs demand damages of of $861,250, representing the decline in value of plaintiffs' PDM shares from July 23, 1981 to August 4, 1981.

Section 9(a)(2) functions to preserve the reliability of reported trading activity as an index of the value of a security. "The

---

**9.** An impied cause of action cannot be recognized where there is "no legislative intent, explicit or implicit" to create such a remedy. *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2087; *see also Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

**10.** Section 9(a)(2) of the Exchange Act states:
(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—
(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

The private right of action for a violation of § 9(a)(2) is created by § 9(e) of the Exchange Act, which states in relevant part:
(e) Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *Trane Co. v. O'Connor Sec.*, 561 F.Supp. 301, 304 (S.D. N.Y.1983) (quoting *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). By enacting § 9(a), Congress "sought to protect the small investor by maintaining a market controlled by natural forces rather than by intervention of artificial manipulative devices...." *Id.* at 305.

The elements of a violation of § 9(a)(2) in a private action brought under § 9(e) were determined in this Circuit in *Crane Co. v. Westinghouse Air Brake*, 419 F.2d 787 (2d Cir.1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970), *rev'd on other grounds*, 490 F.2d 332 (1973). In conformity with *Crane*, the Fifth Circuit explicated the five elements that a plaintiff must plead and prove in order to establish a violation of § 9(a)(2), as follows:

> (1) a series of transactions in a security creating actual or apparent trading in that security *or* raising or depressing the price of that security, (2) carried out with scienter (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff,[11] (5) and affected plaintiff's purchase or selling price.

*Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983) (emphasis in the original).

Neither the Complaint nor plaintiffs' answering papers address the elements of a § 9(a)(2) claim. It is nowhere alleged that PAW engaged in any transactions in PDM after 1:00 PM on July 23, 1981, the time period relevant to this action. Nor do plaintiffs allege that they relied upon any "series of transactions" in PDM made by PAW with an intent to induce the purchase or sale of PDM by others. Since the primary operational element is absent from any § 9(a)(2) claim against PAW, there is no need to address the other elements.[12]

The only allegation which appears to belong in a § 9(a)(2) claim is the allegation that Merrill Lynch "sold into" a declining market in PDM stock in an effort to depress the price of PDM shares in order to induce plaintiffs to sell. (Complaint, ¶ 26). Likewise, the Cross-Claims of Asch contain essentially the same language as the Complaint. The only allegation of purchases or sales by PAW or Merrill Lynch is the reference to Merrill Lynch "selling into" the market for PDM. (Cross-Claims, ¶ 9). As with the § 9(a)(2) claim against PAW, these allegations are unsupported by the record. Rather, the following criteria demonstrate that Merrill Lynch did not "sell into" a declining market for PDM stock and is therefore entitled to the summary dismissal of this claim as a matter of law.

First, the Merrill Lynch "Stock Whatch" report[13] demonstrates that during the ten-day period from July 24, 1981, up until the sell out on August 4, 1981, Merrill Lynch

---

11. The legislative history of § 9 erects a reliance requirement:

    > [T]he bill provides that any person who unlawfully manipulates the price of a security, or who induces transactions in a security by means of fraud or misleading statements ... shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. In such case the burden is on the plaintiff to show the violation or the fact that the statement was false or misleading, and that he relied thereon to his detriment.

    S.Rep.No. 792, 73d Cong., 2d Sess. 12–13 (1934).

12. The Fourth Cross-Claim of Asch states, without citation of authority, that defendant need not make any securities transaction in order to be liable under § 9(a)(2). That statement is contradicted by the very language of § 9(a)(2) and by the authority within this Circuit interpreting that section. *See Crane, supra,* 419 F.2d at 795.

13. The "Stock Whatch" report is a record maintained by Merrill Lynch reflecting all purchases and sales of a particular security through Merrill Lynch on a day to day basis.

did not process a single order for the sale of PDM shares on behalf of any Merrill Lynch customer. *See* Cucchia Aff., Exhibit 3. The report further reflects that the volume of trading in PDM stock by persons other than plaintiffs and Asch was extremely limited both before and after July 23, 1981. Thus, the undisputed documentary evidence establishes that Merrill Lynch did not engage in any scheme to manipulate the price of PDM.

Second, it is undisputed that, in most cases, the securities in plaintiffs' accounts represented the principal or sole collateral for the margin loans which were then outstanding. It is thus clear that the interest of Merrill Lynch was in ensuring that margin calls were met, and that the collateral in plaintiffs' accounts was sufficient to protect Merrill Lynch against loss. There is no evidence that Merrill Lynch (or for that matter PAW) gained anything or stood to gain anything from the sale of plaintiffs' PDM shares. Rather, the only forseeable result of the liquidation of plaintiffs' PDM accounts at $22.00 per share, and the result which actually occurred, is the fact of Merrill Lynch's unsecured debits.

Moreover, the attempts of plaintiffs to establish stock market manipulation or manipulative intent on the part of Merrill Lynch are utterly void of foundational support. The Affidavit of Abe Klein, sworn to on March 21, 1985, ¶ 58 ("Klein Aff."), makes reference to allegations made by Asch (Asch Answer, ¶ 48) which Klein says are "strongly suggestive of market manipulation fraud and [have] implicated defendant Merrill Lynch." Klein is referring to an attempt by some unnamed "broker" to place a buy order relating to PDM at the request of Asch. Klein then asserts that Asch alleges "that defendants PAW and Merrill Lynch refused such order." (Klein Aff., ¶ 58). However, there is no evidentiary support in either the Klein Affidavit or the Asch Affidavit that the order was actu-

ally placed, with whom and by whom it was placed, or the date on which the order was allegedly placed.[14]

The Klein Affidavit also makes reference to deposition testimony by Asch regarding a telephone conversation with the President of PAW and an unnamed, unidentified "representative" of Merrill Lynch. During this conversation, the Merrill Lynch "man" allegedly asserted that the PDM stock would be purchased as a block at $22.00. (Klein Aff., ¶ 58). Inasmuch as both Asch and Merrill Lynch are unable to identify, much less call as a witness, the person who is alleged to have uttered this statement, such testimony is insufficient to preclude summary judgment in favor of Merrill Lynch.

In light of the above, plaintiffs and Asch have failed to submit even a scintilla of evidence tending to establish manipulative purpose on the part of Merrill Lynch. Moreover, there is no evidence that either PAW or Merrill Lynch stood to gain anything from artificially driving the price of PDM down to $22.00 per share. As was held in the seminal case of *Chris-Craft v. Piper Aircraft, supra,* 480 F.2d at 383, "[s]o long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established." The required showing to rebut a motion for summary judgment is heightened when the "factual context renders [a] claim implausible." *Matsushita, supra,* 106 S.Ct. at 1356. Plaintiffs and Asch have failed to raise a genuine issue of factual dispute as to market manipulation and manipulative intent. Accordingly, all § 9(a)(2) claims are dismissed.

### *Section 17(a)*

■ Count Six of the Complaint alleges that defendants violated § 17(a) of the Securities Act, and the Sixth Cross-Claim of

---

14. Asch also asserts that he gave Stephen J. Cucchia, a Compliance Section manager of Merrill Lynch, an order for the sale of PDM stock in early July, 1981, and that Mr. Cucchia refused to accept that order. (Asch Aff., ¶ 8). However,

it is undisputed that, under its Clearing Agreement with PAW, Merrill Lynch had no authority or responsibility for the execution of trades on behalf of PAW. *See* Cavallo Aff., ¶¶ 4, 6.

Asch alleges that PAW and Merrill Lynch did so.

> Section 17(a) of the Securities Act states:
> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
> (1) to employ any device, scheme or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The § 17 claim is based on the same alleged misrepresentations, manipulations and omissions that were described above in connection with the provisions of the Exchange Act that were allegedly violated.[15]

This Court declines to take any position on the question whether there is an implied cause of action for damages for violation of § 17(a) of the 1933 Act. A private cause of action under § 17(a) was recognized by the Second Circuit in *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), on the reasoning that there was "little practical point in denying an action under § 17 once it is established that an aggrieved buyer has a private [right of] action under § 10(b)." However, the most recent statement by the Second Circuit on this issue posits that the conclusion reached in *Kirshner* "may be open to reexamination ... in the light of the subsequent Supreme Court decisions" which explicitly reserved answering the question,

and various authorities which have examined the issue. *Yoder v. Orthomolecular Nutrition, supra,* 751 F.2d at 559 n. 3 (citing, *inter alia, Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); Loss, *Fundamentals of Securities Regulation,* at 1148–50 (1983). "Here, as in so many instances," *Yoder* continues, "§ 10(b) of the Securities Exchange Act and Rule 10b–5 afford plaintiff the same relief as would § 17(a) of the Securities Act." *Yoder* at 559 n. 3 (citations omitted). *See also Mfrs. Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 25 (2d Cir.1986) (declining to comment on the existence of a private right of action under § 17(a)).

Even if the Court were to assume that § 17(a) provides a private right of action, the evidence fails to raise a triable issue of fact under that provision. "[T]he essential elements of a section 17(a) claim are identical to those under section 10(b)." *Eriksson v. Galvin,* 484 F.Supp. 1108, 1127 (S.D.N.Y. 1980) (citing *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1280 n. 2 (2d Cir.1973)). Plaintiffs do not provide sufficient evidence to raise a triable issue of fact as to a § 10(b) violation. The § 17(a) claim is therefore dismissed.

### Section 20(a)

Count Eight of the Complaint alleges that PAW and Merrill Lynch are liable to plaintiffs under § 20(a) of the Exchange Act, and pursuant to the common law doctrine of *respondeat superior,* for failing to properly supervise the accounts of plaintiffs and/or the activities of Asch with respect to the handling of those accounts. Section 20(a) imposes secondary liability on any person who, directly or indirectly, controls any person liable under any provision of the Exchange Act, or rule or regulation promulgated thereunder.[16] 15 U.S.C. § 78t(a).

---

**15.** Plaintiffs claim, in their answering papers, that the series of transactions entered into by plaintiff Abe Klein give rise to a § 17(a) cause of action. (P. Answer Brief, p. 25). The claims of Mr. Klein are examined, *infra,* at 1534–37.

**16.** Section 20 provides, in relevant part, as follows:

> (a) Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation

The record establishes, however, that there is no basis for holding any defendant, including Asch, liable under any provision of the Exchange Act. Plaintiffs contend that Asch admitted to having violated § 10(b) of the Exchange Act and Rule 10b–5. However, Asch never admits to having intentionally misled his customers. Plaintiffs themselves clarify Asch's position by stating "Asch admits participation in the plan and scheme but denies that such participation was knowing." (P. Memo., p. 4). Similarly, as to the claims asserted on behalf of plaintiff Abe Klein, Asch denies that he "either intentionally misrepresented to Klein or made any intentionally false statement, about the security of placing One Hundred Thousand ($100,000.00) Dollars, in a Merrill Lynch Ready Assets Fund." (Asch Answer, ¶ 12). A violation of § 10(b) must consist of "knowing or intentional misconduct." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Asch's admissions lack an essential element of a § 10(b) violation. Therefore, contrary to plaintiffs' arguments, the pleadings fail to establish that Asch violated any federal law.[17]

Accordingly, and for the reasons stated above, no claim exists against PAW or Merrill Lynch[18] under § 20(a). Similarly, neither PAW nor Merrill Lynch may be held liable by this Court under the common law doctrine of *respondeat superior* in the absence of a viable claim under the federal securities laws.

## RICO Claims

Count Nine of the Complaint and the Eighth Cross-Claim allege that PAW and Merrill Lynch are liable under the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961–68 ("RICO"). Plaintiffs contend that PAW and Merrill Lynch, associated as a common enterprise, committed racketeering activities concerning fraud in the sale of securities over a ten-year period. (Complaint, ¶ 71). Asch's Cross-Claims concerning RICO violations are nearly identical. (Cross-Claims, ¶¶ 115–119).

All motions were submitted prior to the recent Supreme Court decision overturning the Second Circuit's approach to private actions under the RICO statute. *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir.), *rev'd*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1986). The Second Circuit had held that a private action under RICO can only proceed against a defendant who has previously been convicted of a predicate act or a RICO violation. The Supreme Court, however, rejected the prior conviction requirement, *Sedima*, 105 S.Ct. at 3284, noting that in enacting RICO, Congress "set out a far-reaching civil enforcement scheme." *Id.*, 105 S.Ct. at 3279. The motions for summary judgment submitted

thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

**17.** Asch's alleged admissions of fraud are a primary element of plaintiffs' arguments in their Cross-Motion for Judgment on the Pleadings against all defendants. Since this argument is, by plaintiffs' own admission, fatally flawed, plaintiffs' Cross-Motion is denied.

**18.** Even if the Court were to assume that Asch violated a provision of the Exchange Act, Merrill Lynch would nevertheless be free of control-

ling person liability under § 20(a). The mere fact that a broker has acted as a clearing agent in circumstances where it is alleged, as here, that the registered representative of the introducing broker defrauded customers, is insufficient to impose controlling person liability on the clearing agent. *See, e.g., Baty v. Pressman, Frohlich & Frost, Inc.,* [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,897 at 95,679 (clearing broker's motion for summary judgment was granted because of the "limited involvement" of the clearing broker in the activities of the introducing firm notwithstanding allegations that the clearing broker was a controlling person of an introducing broker whose registered representative had allegedly defrauded plaintiff). *Accord O'Keefe v. Courtney,* No. 85–5636, slip op. (N.D.Ill. Nov. 21, 1985) [Available on WESTLAW, DCTU database].

by PAW and Merrill Lynch, as they pertain to the RICO claims, are predicated solely on the Second Circuit's decision in *Sedima* and other closely related cases. Thus, PAW and Merrill Lynch claim that, in the absence of any allegation that they have been convicted of a predicate crime (Memorandum of Law submitted by Merrill Lynch, p. 33) ("Merrill Lynch Memo."), plaintiffs and Asch have failed to state a civil RICO claim. In light of subsequent judicial interpretations of the RICO Act, plaintiffs' allegations will be considered under the standards set forth by the Supreme Court in *Sedima* and the recent line of cases within this District that apply its holding.

■ To state a claim for a civil RICO violation, a plaintiff must prove injury to his business or property by reason of defendant's conduct of an enterprise through a "pattern of racketeering activity." *Rojas v. First Nat'l Bank,* 613 F.Supp. 968, 971 (E.D.N.Y.1985) (citing *Sedima* 105 S.Ct. at 3285.) An act of "racketeering activity" is defined as certain enumerated crimes, including mail, wire and securities fraud. 18 U.S.C. § 1961(1). Section 1961(5) defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" within a ten-year period. Thus, even if established, racketeering activity alone is not a RICO violation. In addition there must be both a "pattern of racketeering activity" and the necessary nexus to an interstate enterprise. *See* 18 U.S.C. § 1962(a)–(c).

The Supreme Court, in footnote 14 of *Sedima,* stated that the definition in 18 U.S.C. § 1961(5) that a pattern requires at least two acts of racketeering activity does not necessarily indicate that a pattern is comprised of only two acts. The Court continued:

> The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As

the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Id.* 105 S.Ct. at 3285 n. 14. Since *Sedima,* lower courts have attempted to discern what the Supreme Court meant in this footnote. Specifically, in this District, there is a line of cases which have adopted a restrictive definition of "pattern." As cogently stated by Judge Sweet: "the Supreme Court's enhancement of the 'continuity' aspect of the pattern requirement casts doubt on the continued validity of cases which carve one [allegedly] criminal episode into multiple predicate act 'pieces' and allege a 'pattern' within the meaning of the statute." *Rush v. Oppenheimer & Co.,* 628 F.Supp. 1188, 1199 (S.D.N.Y.1985).

In a recent case, with facts similar to those at bar, Judge Goettel analyzed the impact of footnote 14 on judicial determinations of what constitutes a "pattern" and concluded that "[t]he fact that a single activity may continue over a particular length of time does not necessarily establish a pattern. Indeed, the issue is not the continuity of a single activity, but whether the defendants had a *practice* of engaging in the same or similar types of activity." *Richter v. Sudman,* 634 F.Supp. 234, 238–39 (S.D.N.Y.1986) (emphasis in the original).

In *Richter,* a group of investors brought a civil RICO action against a corporation, its shareholders, officers, directors and persons otherwise affiliated with the corporation. Plaintiffs asserted four separate but related fraudulent schemes of false inducement, concealing premature withdrawal of escrow funds and unauthorized expending of escrow funds. Analyzing whether the alleged frauds constituted a pattern of racketeering activity giving rise to a violation of civil RICO, Judge Goettel stated:

Although the specific acts underlying each alleged fraud varied, each served a common end.... To hold that this single scheme constitutes a pattern of racketeering activity would be to carve a single fraudulent episode into its component parts. The plaintiffs have not alleged that the defendants have engaged in similar schemes to defraud other investors, nor is there any evidence that this particular scheme is on-going or continuous. Once the defendants dispose of the investors' funds, the fraudulent scheme comes to an end. There is no continuing threat of criminal activity.

*Id.* at 240.

Similarly, Judge Sand, after a thorough review of post-*Sedima* cases and commentaries, concluded that more than two related acts are needed to satisfy the pattern of racketeering activity requirement. *Soper v. Simmons Int'l, Ltd.*, 632 F.Supp. 244 (S.D.N.Y.1986). Judge Sand further opined that "acts performed in the execution of a single [allegedly] fraudulent scheme" were insufficient. *Id.* at 254 (quoting *Graham v. Slaughter*, 624 F.Supp. 222, 225 (N.D.Ill. 1985). This reasoning was very recently affirmed in a subsequent decision by Judge Sand. *Savastano v. Thompson Medical Co.*, 640 F.Supp. 1081 (S.D.N.Y.1986). *Accord Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986) (systematic fraud by persons who stole natural gas from the plaintiff did not constitute a pattern because "there was no proof that defendants had ever engaged in such activities in the past and there was no proof that they were engaged in other criminal activities elsewhere....") *Id.* at 252.

■ Plaintiffs and Asch fail to provide evidentiary support for their allegation that PAW and Merrill Lynch have "committed fraud in the sale of securities over a ten-year period." (Complaint, ¶ 71). The evidence presented bears solely upon the alleged "scheme and conspiratorial plan" to defraud plaintiffs of their holdings in PDM. Notwithstanding that plaintiffs are unable to support a claim arising under the federal securities laws, the RICO claim can best be

characterized as "a single [allegedly] fraudulent effort, implemented by several [allegedly] fraudulent acts." *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831 (N.D.Ill.1985). As such, it is insufficient to meet RICO's "pattern" requirement.

### The Additional Claims Brought by Abe Klein and Ruth Baum

■ Counts One through Three of the Complaint are brought by plaintiffs Abe Klein (Counts One and Two) and Ruth Baum (Count Three). These Counts do not specify what law was violated by the alleged misconduct of defendants. After a careful review of the record, the Court finds that the allegations contained in the first three Counts may be characterized as "unauthorized trading" claims. Such allegations amount to no more than breach of contract or fiduciary duty, *see Pross v. Baird, supra,* 585 F.Supp. at 1460, and, as such, are not actionable under the federal securities laws. For the reasons set forth below, the Court finds that plaintiffs Klein and Baum have failed to state a material issue of factual dispute which would justify a trial of their claims under any provision of the federal securities laws.

■ In Counts One and Two of the Complaint, plaintiff Abe Klein sets forth allegations regarding events occurring at the same time as the alleged scheme to to depress the price of PDM, but ancillary to the scheme. Count One seeks $50,000 for plaintiffs Abe and Rena Klein (Rena Klein is the wife of Abe Klein). The $50,000 was allegedly lost because a U.S. Treasury Bill ("T–Bill") in that amount was purchased for the Klein account, then subsequently sold to meet margin calls in the Klein account. Beyond this, it is not clear exactly what Klein claims. A comparison of the Complaint, the Klein Affidavit and Klein's deposition testimony reveals that each contradicts the other.

After a thorough review of the record, the Court finds the following sequence of events to be undisputed. On July 6, 1981, a check for $100,000 was deposited into the

account of Abe and Rena Klein. This deposit had the effect of satisfying the then outstanding margin call in that account. The next day, July 7, 1981, $100,000 was transferred out of the account and used to purchase $100,000 shares of Merrill Lynch Ready Assets Trust ("MLRAT"), valued at $1.00 per share.

At the time, federal regulations dictated that MLRAT funds could not be counted for margin maintenance purposes. (Cavallo Aff., ¶ 17). Apparently, for this reason, a portion of Klein's MLRAT shares were used to purchase $50,000 in Treasury Bills ("T-Bills") which were used as collateral for the margin account of the Kleins. Thereafter, the 50,000 remaining shares of MLRAT were liquidated from Klein's account and converted to cash. The $50,000 in T-Bills was ultimately liquidated to satisfy a margin call on August 5, 1981. (Asch Aff., ¶ 14). Klein does not claim that this sale, of itself, was improper.

The Complaint alleges that Klein was misled by Asch's representations into investing the additional $100,000 into the Klein account. (Complaint, ¶¶ 33, 34). Asch admits that he assured Klein that the additional investment of $100,000 would not be applied to Klein's margin account. (Asch Answer, ¶¶ 1, 12). In deposition, Klein testified that putting up the $100,000 had nothing to do with PDM (Transcript of Deposition of Abe Klein, pp. 95–96) ("Klein Dep."); (Reply Affirmation of Robert Brantl, sworn to on May 3, 1985, Exhibit A) ("Brantl Reply Aff."), and that he put the money into the account so as not to have the account sold out. (Klein Dep., pp. 216–18; Brantl Aff., Exhibit B). Although Klein swears in his affidavit that he "repeatedly ordered Asch to sell PDM" for his own account (Klein Aff., ¶ 13) and that he "demanded the liquidation of ... [his] stock position in PDM" (Klein Aff., ¶ 39), in deposition Klein testified that he "never gave (Asch) a direct order" to sell PDM (Klein Dep., p. 162; Brantl Reply Aff., Exhibit C).

Klein claims that on July 10, 1981, he attempted to rescind the transaction and

ordered Asch to withdraw the $100,000 from the MLRAT. (Complaint, ¶ 36). Plaintiffs' supporting papers state that the $50,000 T-Bill was bought "without authorization from Klein." (Plaintiffs' Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings). Yet, paragraph 40 of the Complaint directly implies that Klein agreed to the purchase of the T-Bill. The claim that the sale was unauthorized appears first in Klein's deposition testimony. The crux of Klein's claim is, as far as the Court can discern from the contradicting papers of plaintiffs themselves, an unauthorized purchase resulting in the payment, upon liquidation of the T-Bill, of $50,000 to Merrill Lynch. However, PAW and Merrill Lynch claim that if the T-Bill had not been liquidated, the Kleins would owe Merrill Lynch $50,000 more than they do presently.

Count One contains additional claims relating to Klein's alleged problems with the MLRAT shares in his account. However, the Kleins got back the money invested in MLRAT that was not used to purchase the T-Bill and no damages are sought in connection with the MLRAT purchase. Thus, the Court has no reason to address these allegations.

The Klein Affidavit (¶ 36) asserts that Asch's conduct in causing Klein to purchase the 100,000 shares of MLRAT was the result of "marching orders" from Merrill Lynch received by Asch's superiors at PAW. However, Asch himself makes no such assertion and the record is void of evidentiary support for this claim. The Asch Affidavit does, however, contain the following assertion:

> According to Burton Cavallo, Section manager for Merrill Lynch's Agency Clearing Department, the manner in which Merrill Lynch and PAW used the $100,000.00 deposit in Klein's account to satisfy the margin call was an erroneous use of such funds.

(Asch Aff., ¶ 11, Exhibit Q). A reading of Exhibit Q discloses that Cavallo, at one point concerned about the debit balance in Klein's margin account, sought to prevent

Klein from liquidating the remaining $50,-000 in that account. However, the Cavallo Affidavit (¶¶ 20–21) establishes that Klein subsequently withdrew all of the money from the MLRAT which was not used to purchase the T–Bill. Klein himself makes no claim that any damage was suffered by reason of the delay.

In Count Two, Klein alleges that the sale of a substantial portion of PDM from his own account would have caused a cessation in the trading of PDM and the necessity to arrange an orderly block sale of PDM. Thus, Klein alleges that "[b]ut for the intentional frauds and misstatements" as alleged in Count One, the shares of PDM in the accounts of all plaintiffs would have been sold before the drop in the price of PDM to $22.00 per share and the losses suffered by all plaintiffs would have been avoided. (Complaint, ¶ 46) Inasmuch as Klein is unable to factually support, let alone clearly state, a claim in Count One, the allegations contained in Count Two of the Complaint are summarily dismissed.

■ Count Three is brought by Ruth Baum, the only plaintiff who did not have a margin account. Ruth Baum alleges that on three different occasions she was induced to execute documents in which she guaranteed her husband's account, and that the inducement consisted of false representations of the defendants' intentions. (Complaint, ¶¶ 49–50). Mrs. Baum does not allege, however, that her execution of the documents caused her any damage. Instead, she seeks $65,000 in damages because "in breach of their representations and assurances" defendants transferred Ruth Baum's securities to her husband's account and sold them to satisfy his margin calls.[19] (Complaint, ¶¶ 51–52). Mrs. Baum's claim sounds in breach of contract and perhaps conversion. Even if all her allegations are taken as true, she has nothing approaching a securities fraud claim.

### The Remaining Cross-Claims of Harold Asch

In essence, Asch's Cross-Claims seek recovery for (1) injury to plaintiffs; (2) damage to his reputation; and (3) financial losses suffered by Asch. The Court considers each in turn.

■ In the first instance, Asch does not have standing to assert a claim for damages on behalf of plaintiffs. This is particularly so where, as here, plaintiffs are asserting their own claims. Thus, to the extent that Asch's Cross-Claims seek recovery on behalf of all plaintiffs, they are dismissed for failure to state a claim upon which relief can be granted.

■ Second, Asch has not stated a valid claim for "loss of reputation." New York does not recognize any cause of action for loss of reputation other than a claim for defamation. *See Terry v. County of Orleans,* 72 A.D.2d 925, 422 N.Y.S.2d 826 (4th Dep't 1979). Asch has failed to even allege the necessary elements of a cause of action for defamation. Moreover, there is no basis for recovery based on loss of reputation under the federal securities laws. *See* 15 U.S.C. § 77bb(a); *Phillips v. Kapp,* 87 F.R.D. 548 (S.D.N.Y.1980).

Finally, Asch's claim for damages incurred by him for various alleged violations of the federal securities laws and common law are deficient for the reasons stated in the "Legal Discussion" of this Opinion specifically addressed to those claims.

### Debit Balances and Common Law Claims

In the absence of a valid claim under the federal securities laws or RICO, the Court lacks pendent jurisdiction over plaintiffs' related common law claims and the Merrill Lynch Motion for Summary Judgment for Payment of Debit Balances. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

---

**19.** It is significant that Ruth Baum, who is the person claiming to have been defrauded, submitted no affidavit on her own behalf in connection with her claim. Instead, she relies on the affidavit of Abe Klein who, in turn, relied on the advice of his attorney. *See* Klein Aff., ¶ 43. Thus, the evidence is, at best, attenuated; and, at worst, double hearsay.

## CONCLUSION

For the reasons stated herein, summary judgment is granted in favor of PAW and Merrill Lynch, dismissing the Complaint, the cross-motions of plaintiffs and the Cross-Claims of Asch. Merrill Lynch's Motion for Summary Judgment for Payment of Debit Balances is also dismissed.

SO ORDERED.